# In the United States Court of Federal Claims

No. 18-1623

Filed: October 3, 2019

|  |  |  |
|---|---|---|
| MICHAEL CONWAY, *in his capacity as Liquidator of Colorado Health Insurance Cooperative, Inc.* | ) ) ) ) | |
| Plaintiff, | ) ) | Keywords: Affordable Care Act; Reinsurance Program; Right of Offset; 42 U.S.C. § 18061; 45 C.F.R. § 156.1215. |
| v. | ) ) | |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | |

*Stephen McBrady*, Crowell & Moring LLP, Washington, D.C., for plaintiff.

*Marc S. Sacks*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

***HERTLING***, Judge

Plaintiff Michael Conway, in his capacity as Liquidator of Colorado Health Insurance Cooperative, Inc. ("the Cooperative"), sued the United States for payments that the U.S. Department of Health and Human Services' Center for Medicare and Medicaid Services ("HHS") allegedly owes the Cooperative under the Patient Protection and Affordable Care Act ("ACA").  HHS reduced or "offset" the amount of its payments to the insolvent Cooperative on account of debts allegedly owed to HHS by the Cooperative.  The Liquidator argues that, under the McCarran-Ferguson Act, Colorado law governs the priority of payment of debts owed by an insurer in liquidation proceedings.  Therefore, the Liquidator argues, HHS must, under Colorado insurance liquidation law, pay the amount it offset.  The Liquidator requests the $24,489,799 that HHS allegedly offset, pre- and post-judgment interest, costs, attorneys' fees, and any other relief the Court deems proper and just.  For the following reasons, the plaintiff's Motion for Summary Judgment is granted in part and denied in part, and HHS's Cross-Motion to Dismiss is granted in part and denied in part.

I.      BACKGROUND

A.      ACA Programs and the Netting Rule

In the ACA,[1] Congress created the Consumer Operated and Oriented Plan ("CO-OP") program, to ensure that states' health-benefit marketplaces were stocked with qualified insurance plans for healthcare consumers to buy.  42 U.S.C. § 18042.  The CO-OP program provided loans and grants to "qualified nonprofit health insurance issuers to offer qualified health plans in the individual and small group markets."  *Id.*  It is undisputed that the Cooperative was a CO-OP program insurer.[2]

To help insurers offset the risks of providing broader coverage under the ACA's new requirements, the ACA required each state to establish certain discreet payment programs. *See, e.g.*, 42 U.S.C. § 18061(a) ("Each State shall . . . establish (or enter into a contract with) 1 or more applicable reinsurance entities to carry out the reinsurance program . . . ."); § 18063(a) ("[E]ach State shall assess a charge on health plans and health insurance issuers . . . . [E]ach State shall provide a payment to health plans and health insurance issuers . . . .").  For the years relevant to this case, these programs included the reinsurance and risk-adjustment programs.[3]

Although the ACA allowed each state to operate its own reinsurance and risk-adjustment programs, all but two states have opted out, so HHS administers the programs for the other states.  *See* 42 U.S.C. § 18041 (providing that if a state opts out (or fails to establish an exchange, a reinsurance program, or a risk-adjustment program, HHS "shall establish and operate such exchange within the State and [HHS] shall take such actions as are necessary to implement" the reinsurance and risk-adjustment programs).  HHS operated the reinsurance and risk-adjustment programs for Colorado at the times relevant to this case.

The reinsurance program required that insurers make payments in 2014, 2015, and 2016 to one or more "reinsurance entities." 42 U.S.C. § 18061.  Those entities were then required to distribute the funds to "health insurance issuers . . . that cover[ed] high risk individuals." *Id.*

---

[1] On March 23, 2010, Congress enacted the ACA, Pub. L. No. 111-148, 124 Stat. 119.  A week later, on March 30, 2010, Congress amended the ACA through the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029.

[2] A challenge to the constitutionality of the ACA is currently pending in the Fifth Circuit.  *See State of Texas, et al. v. United States, et al.*, 5th Cir. No. 19-10011.  The defendant does not argue that the outcome of that case will affect the plaintiff's claim for relief in this matter.

[3] The plaintiff has alleged in another case in this Court that it is owed $111,420,992 in payments under the ACA's risk-corridors program.  *See* Notice of Lodging Certification of Class Membership, *Health Republic Insur. Co. v. United States*, No. 16-259 (Fed. Cl. June 12, 2017), ECF No. 57.  That case is stayed pending Supreme Court appeal, to be argued on December 10, 2019, of other risk-corridors cases.  *See* Order, *Health Republic*, No. 16-259, ECF No. 69 (staying case pending appeal of *Land of Lincoln Mut. Health Ins. Co. v. United States*, 892 F.3d 1184 (Fed. Cir. 2018), *cert. granted*, 139 S. Ct. 2744 (2019), and *Moda Health Plan, Inc. v. United States*, 892 F.3d 1311 (Fed. Cir. 2018), *cert. granted*, 139 S. Ct. 2743 (2019)).

The risk-adjustment program, also operated by HHS, requires that insurers whose plans bear low actuarial risk pay the state (or the federal government) a specified amount. 42 U.S.C. § 18063. That governmental entity then redistributes those payments to insurers whose plans bear high actuarial risk. *Id.*

On March 11, 2014, HHS promulgated a final rule ("the Netting Rule") explaining the method by which it would aggregate and offset monies owed by or to different insurers under these and other ACA payment programs. *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,744, 13,817 (Mar. 11, 2014) (codified at 45 C.F.R. § 156.1215); Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2017, 81 Fed. Reg. 12,204, 12,317-18 (Mar. 8, 2016) (technical amendments to March 2014 rule). The Netting Rule provides:

> (a) Netting of payments and charges for 2014. In 2014, as part of its monthly payment and collections process, HHS will net payments owed to [qualified health plan ("QHP")] issuers and their affiliates under the same taxpayer identification number against amounts due to the Federal government from the QHP issuers and their affiliates under the same taxpayer identification number for advance payments of the premium tax credit, advance payments of cost-sharing reductions, and payment of Federally-facilitated Exchange user fees.
>
> (b) Netting of payments and charges for later years. As part of its payment and collections process, HHS may net payments owed to issuers and their affiliates operating under the same tax identification number against amounts due to the Federal or State governments from the issuers and their affiliates under the same taxpayer identification number for advance payments of the premium tax credit, advance payments of and reconciliation of cost-sharing reductions, payment of Federally-facilitated Exchange user fees, payment of any fees for State-based Exchanges utilizing the Federal platform, and risk adjustment, reinsurance, and risk corridors payments and charges.
>
> (c) Determination of debt. Any amount owed to the Federal government by an issuer and its affiliates for advance payments of the premium tax credit, advance payments of and reconciliation of cost-sharing reductions, Federally-facilitated Exchange user fees, including any fees for State-based Exchanges utilizing the Federal platform, risk adjustment, reinsurance, and risk corridors, after HHS nets amounts owed by the Federal government under these programs, is a determination of a debt.

45 C.F.R. § 156.1215.

### B.     Factual Background

In 2012, HHS approved the Cooperative's application to operate as a CO-OP program insurer and executed a loan agreement with the Cooperative.[4]

The Cooperative soon ran into financial difficulties.  After an unsuccessful state-ordered supervision and rehabilitation process, in January 2016 a Colorado state court placed the Cooperative in liquidation.  Liquidation is a bankruptcy-like insolvency proceeding established by state law in which an appointed "liquidator" collects any money an insolvent insurer is owed and distributes the insurer's assets to its creditors according to the priority scheme applied by the liquidation court.

In March 2016, HHS paid the Cooperative an early reinsurance payment of $14,154,424 for the previous year.  Later that month, the Liquidator provided HHS a notice for creditors to submit their claims in the Cooperative's liquidation proceeding.  The notice gave HHS the remainder of the calendar year to respond.

In June 2016, HHS published the amounts it owed insurers for the prior benefit year. According to HHS, it owed the Cooperative $38,644,223.02 (later amended to $38,664,334.67). To date, HHS has only paid the Cooperative $14,174,535.

According to the Liquidator, in August 2016, HHS notified him that HHS would offset $20,255,084 of the amount the agency owed the Cooperative under the reinsurance program against $21,775,432 that the Cooperative owed HHS under the risk-adjustment program. According to HHS, however, the agency executed a series of offsets between February 2017 and May 2018 to reconcile the Cooperative's various ACA program accounts.

In late December 2016, HHS responded to the Liquidator's notice.  An April 2017 letter from the Liquidator requested that HHS provide additional information by June 1, 2017.  Weeks after that response deadline, HHS sought an extension, and the Liquidator extended the response deadline to August 14.  HHS did not respond by the August deadline.

On August 30, 2017, the Liquidator sent HHS a claims determination letter, disallowing the submitted claims and requesting the "return of all unauthorized offsets."  HHS did not object to that claim determination within the 60-day limit under Colorado law.  *See* Colo. Rev. Stat. § 10-3-538(1).  In December 2017, on the Liquidator's motion, a Colorado court affirmed the Liquidator's claim determination.

### C.     Procedural Background

On October 19, 2018, the Liquidator filed a complaint in this Court, asserting two claims for relief.  Count I of the complaint alleges that HHS has failed to make obligatory payments under the reinsurance program.  Count II of the complaint alleges that HHS's offset of payments

---

[4] The facts outlined here are drawn from the complaint, whose well-pleaded allegations are accepted as true for purposes of the defendant's motion.  The defendant has not otherwise contested these allegations for purposes of the plaintiff's motion for summary judgment.

it owes to the Cooperative violates Colorado law and is therefore invalid.  The Liquidator later filed a Motion for Summary Judgment and HHS moved to dismiss.  The motions are fully briefed, and the Court heard oral argument on September 9, 2019.

## II.    STANDARD OF REVIEW

Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") authorizes a party to file a motion to dismiss for "failure to state a claim upon which relief can be granted."  Such a motion "'is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.'"  *Welty v. United States*, 926 F.3d 1319, 1323 (Fed. Cir. 2019) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

RCFC 56 authorizes a party to file a motion for summary judgment.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).

## III.   JURISDICTION

The Tucker Act provides this Court with jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491.  The Tucker Act "operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)" if that source of law "'can fairly be interpreted as mandating compensation by the Federal Government.'"  *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)).

The ACA's reinsurance program, when administered directly by HHS, can fairly be interpreted as mandating compensation.  The pertinent provision provides that each state "shall . . . establish (or enter into contract with) 1 or more applicable reinsurance entities to carry out the reinsurance program."  42 U.S.C. § 18061(a).  The program also requires that an "applicable reinsurance entity" use the payments it collects "to make reinsurance payments to health insurance issuers."  42 U.S.C. § 18061(b).  Together, these provisions require that money collected from insurers be distributed to other insurers, according to applicable formulas.

HHS's implementing regulations reinforce this conclusion.  One regulation provides that "HHS will allocate and disburse to each State operating reinsurance (*and will distribute directly to issuers if HHS is operating reinsurance on behalf of a State*), reinsurance contributions collected from contributing entities."  45 C.F.R. § 153.235 (emphasis added).  HHS's regulation further provides, "If a State establishes a reinsurance program, the State must ensure that the applicable reinsurance entity . . . [m]akes reinsurance payments."  45 C.F.R. § 153.240.  These rules make clear that 42 U.S.C. § 18061(b) mandates distributions.

Finally, whether the disputed payment was paid directly to the Cooperative or used to offset the Cooperative's debt is irrelevant to this Court's jurisdiction.  When an agency uses an offset, a plaintiff may invoke the Tucker Act to challenge the underlying debt.  *See Brazos Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998).

5

HHS argues that this Court lacks jurisdiction over Count II of the complaint because it arises under state law.  Not so.  The Cooperative's right to payment under the reinsurance program arises under 42 U.S.C. § 18061.  The reason that state law is potentially relevant is that the ACA's non-preemption clause, 42 U.S.C. 18041(d), acknowledges the applicability of nonconflicting state law, and the McCarran-Ferguson Act generally instructs that the insurance business "shall be subject to the laws of the several states."  15 U.S.C. § 1012.  If McCarran-Ferguson applies, the question of the Cooperative's right to payment under 42 U.S.C. § 18061 necessarily encompasses the question of whether HHS's offset was permissible under Colorado law, but that question arises solely because of the money-mandating elements of the relevant ACA provision and its interplay with other federal laws.

## IV.    DISCUSSION

### A.    Count I

Count I of the Complaint alleges that HHS's offset violated the ACA.  The Liquidator argues that the ACA and HHS regulations require timely payment to plan issuers and HHS's offset reduced the amount paid and violated this payment requirement.  HHS responds that it has the inherent authority to employ offset among different ACA programs.  HHS argues that it both put insurers on notice that it might use its offset authority in the context of the ACA by promulgating the Netting Rule, and then in fact used its offset authority to reconcile the Cooperative's accounts on several occasions.  HHS concludes that because it had the power to do what it did, and because an offset constitutes the payment of money, the Cooperative received all the money it was owed.

The general right of offset "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'"  *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)).  The federal government has the same offset rights as other creditors.  *See United States v. Munsey Tr. Co. of Washington, D.C.*, 332 U.S. 234, 239 (1947).

The Court analyzes below whether the ACA or other applicable law authorized HHS's offset.  As a threshold matter however, the Court holds that the ACA does not *prohibit* offset otherwise allowed under federal common law or state law.  Count I of the complaint does not provide an independent basis for relief, and accordingly it is dismissed.

### B.    Count II

Count II of the Complaint alleges that the offset HHS made under the Netting Rule after the Cooperative entered liquidation was invalid under Colorado's insurance liquidation priority scheme, and that the ACA itself and the McCarran-Ferguson Act prevents HHS's Netting Rule from preempting Colorado's insurance liquidation priority scheme.  HHS relies on the Netting Rule as the authority for its offset.  It argues that because the ACA is an act of Congress relating specifically to insurance, HHS's Netting Rule implementing the ACA preempts even conflicting state insurance laws that would otherwise apply by virtue of the McCarran-Ferguson Act.

Further, HHS argues, federal law should govern HHS's property rights "arising under nationwide federal programs."

The Court holds that HHS's offset was invalid under Colorado's insurance liquidation priority scheme.  Because neither the ACA nor another statute authorizes the Netting Rule's application in the insurance liquidation context, HHS must have taken its offset in its capacity as a creditor.  Although federal law governs HHS's rights as a creditor in implementing the nationwide reinsurance and risk-adjustment programs, its interest in uniformity is insufficient to warrant this Court creating a federal common law rule to displace Colorado's insurance liquidation priority scheme.

### 1.      No Statutory Authority for the Netting Rule

The ACA preempts state laws that prevent the application of its provisions, but HHS's Netting Rule does not likewise preempt state law because it is not required or authorized by the ACA or another statute.  The title of the ACA that provides for the reinsurance and risk-adjustment programs includes a clause defining the extent to which the ACA preempts state law:

> NO INTERFERENCE WITH STATE REGULATORY AUTHORITY.—Nothing in this title shall be construed to preempt any State law that does not prevent the application of the provisions of this title.

Pub. L. No. 111-148, § 1321(d), 124 Stat. 119, 187 (codified as 42 U.S.C. § 18041(d)).

The Eighth Circuit interpreted this clause as disclaiming any ACA preemption over the entire field of health insurance.  *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022 (8th Cir. 2015) (quoting Black's Law Dictionary 1226 (8th ed. 2004)) ("This preemption clause is a narrow one, and only those state laws that 'hinder or impede' the implementation of the ACA run afoul of the Supremacy Clause."); *accord UnitedHealthcare of New York, Inc. v. Vullo*, 323 F. Supp. 3d 470, 481 (S.D.N.Y. 2018) (holding that the ACA does not preempt the field of health insurance), *appeal argued*, No. 18-2583 (2d Cir. Feb. 8, 2019).  Despite its narrow reading of the clause, that court held invalid several state law limits on what healthcare plan counselors could tell consumers because it found the limits incompatible with HHS's ACA regulations.  *St. Louis Effort for AIDS*, 782 F.3d at 1022, 1024-27.

Whether an agency-promulgated rule preempts state law raises two separate questions.  *See New York v. F.E.R.C.*, 535 U.S. 1,18 (2002).  First, is the agency's regulation authorized by federal statute?  If so, second, does the state law conflict with the agency's regulation?  *St. Louis Effort for AIDS* only addressed the latter question.

Here, the Netting Rule does not preempt Colorado's insurance liquidation priority scheme because neither the ACA nor another statute require or authorize HHS to issue a rule offsetting among different ACA programs payments HHS owes to an insurer in liquidation proceedings and contributions HHS is owed.  The Netting Rule provides operational convenience but its application of offset in an insolvency proceeding is not vital to the application of the ACA's provisions.

As HHS repeatedly noted in oral argument, the Netting Rule was the product of notice-and-comment rulemaking. HHS's 116-page notice of proposed rulemaking cites the ACA sections requiring establishment of the reinsurance and risk-adjustment programs as authority, but does not offer a more specific basis for the Netting Rule other than greater efficiency. *See* HHS Notice, 78 Fed. Reg. 72322-01 (proposed Dec. 2, 2013); HHS Notice, 79 Fed. Reg. at 13,817 (final rule) ("This process will permit HHS to calculate amounts owed each month, and pay or collect those amounts from issuers more efficiently. . . . We believe that this process will enable HHS to operate a monthly payment cycle that will be efficient for both issuers and HHS."). *Cf. id.* at 13,746 (asserting HHS authority to collect user fees for exchanges it operates, citing the ACA provision requiring HHS to operate an exchange when a state does not and separately citing "31 U.S.C. § 9701 [which] permits a Federal agency to establish a charge for a service provided by the agency.").

Although the ACA required HHS to "take such actions as are necessary to implement" the reinsurance and risk-adjustment programs whenever a state did not, the Court will not infer from the ACA's requirements or structure that applying the Netting Rule's combined accounting regime in state insurance liquidation proceedings is necessary to implement the reinsurance and risk-adjustment programs.

The ACA did not require that HHS administer both programs for a state. Indeed, it is not clear that Congress contemplated that HHS would wind up administering both programs for *nearly all* of the states.

To the contrary, HHS admits that it does not operate a single accounting regime covering the reinsurance, risk-adjustment, and risk-corridor programs for all 50 states. States can administer one of the three programs and choose to have HHS administer the other two. *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016; Final Rule, 80 Fed. Reg. 10,750, 10,758–9 (Feb. 27, 2015) (noting that Connecticut administers its own reinsurance program and Massachusetts administers its own risk-adjustment program). That HHS can administer each program for any state that wanted it to without also administering that state's other programs undermines HHS's argument that the reinsurance and risk-adjustment programs are so integrated that netting is required as part of the ACA's structure.

As for other statutes, the Netting Rule, its rulemaking notices, and HHS's filings in this case do not claim that the Netting Rule was an implementation of the 1982 Debt Collection Act. *Cf. McCall Stock Farms, Inc. v. United States*, 14 F.3d 1562, 1565-67 (Fed. Cir. 1993). The Debt Collection Act authorized agencies to issue regulations with procedures for taking administrative offsets to collect debts and was "intended to supplement, and not displace, the government's pre-existing offset rights under the common law." *Id.* at 1566 (citing General Accounting Office, Federal Claims Collection Standards, 49 Fed. Reg. 8891 (1984) (final rule)).

## 2.      The McCarran-Ferguson Act is Inapplicable

The McCarran-Ferguson Act does not directly affect the Netting Rule's preemptive effect because neither the Netting Rule nor any offset authority the Netting Rule exercises qualifies as an "Act of Congress." The McCarran-Ferguson Act generally prevents federal law from preempting state insurance law. It provides "[t]he business of insurance . . . shall be subject to

the laws of the several States which relate to the regulation . . . of such business."  15 U.S.C. § 1012.  The McCarran-Ferguson Act further provides, "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act [of Congress] specifically relates to the business of insurance."  *Id.*

The Courts of Appeals have consistently held McCarran-Ferguson inapplicable to non-statutory sources of federal law.  Three circuits have excluded treaties from McCarran-Ferguson's reference to an "Act of Congress."  *See Safety Nat'l Cas. Corp. v. Certain Underwriters At Lloyd's, London*, 587 F.3d 714, 718 (5th Cir. 2009) (*en banc*) (holding a treaty is not an "Act of Congress" under McCarren-Ferguson with dissenters only disagreeing as to whether the court was construing the treaty or its implementing legislation); *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 390 (4th Cir. 2012)  (citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 428 (2003)) (limiting "Act of Congress" to "domestic commerce legislation").  The Second Circuit has held that federal common law—even when later codified by statute—is not an "Act of Congress" to which McCarran-Ferguson applies.  *Stephens v. Nat'l Distillers and Chem. Corp.*, 69 F.3d 1226, 1234 (2d Cir. 1995), *amended* (Jan. 11, 1996) ("[T]he McCarran–Ferguson Act did not by its terms or in its history purport to overturn any pre-existing international or common law.  To bring the McCarran–Ferguson Act into play simply because Congress chose to codify that pre-existing law would truly defy common sense.")

Because no "Act of Congress" authorizes the Netting Rule, McCarran-Ferguson does not affect whether the Netting Rule preempts Colorado law prohibiting offset in insurance liquidation proceedings.

### 3.    HHS's Offset Right as a Creditor

The inherent collection and payment authority HHS exercises includes its rights as a creditor which are not specifically enlarged by the ACA's provisions.  Without statutory authority from the ACA to implement an offset rule in its capacity as a regulator, HHS could only have promulgated the Netting Rule as notice of its intent to exercise whatever offset authority it normally enjoys as a creditor.

Federal common law defining the rights of federal agency-creditors in the government contracts context recognizes a broad right of offset.  Colorado law, however, prohibits creditors from using offset to circumvent its insurance liquidation priority scheme.

### a.    Offset Under Federal Common Law

The federal government has the same offset rights as other creditors.  *Munsey Tr.*, 332 U.S. at 239.  The federal courts have repeatedly recognized a general right of offset when determining the rights of agency creditors and government contractor debtors as a matter of federal common law.

The Federal Circuit has followed the Supreme Court's holding in *Strumpf* that a valid offset requires "(i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff."  *Applied Cos. v. United States*, 144 F.3d 1470, 1474 (Fed. Cir.

1998) (quoting *Strumpf*, 516 U.S. at 19); *see also Johnson v. All-State Const., Inc.*, 329 F.3d 848, 854 (Fed. Cir. 2003) (applying *Strumpf*'s three-part test).

Here, all three requirements for a procedurally valid offset under the federal common law of contracts were met.  The parties agree that HHS decided to effectuate an offset of the Cooperative's accounts, provided notice to that effect, and modified its debt records accordingly.  Consequently, HHS's use of offset would have been procedurally valid if only federal common law controlled the Cooperative's right to payment.

Cases like *All-State Construction* recognize a right to use offset when the parties' contract rights are governed primarily by federal common law.  *See* 329 F.3d at 852.  These cases, however, do not answer the question of whether an agency-creditor has a right to use offset when the rights of the parties are not primarily defined by federal common law, like in state-law insurance liquidation proceedings.

### b.        Offset Under Colorado Law

Analyzed under Colorado law, HHS's offset violates Colorado's insurance liquidation priority scheme by leap-frogging claimants with higher priority.  *See* Colo. Rev. Stat. § 10-3-541.  Seeking to avoid this problem, HHS invokes Colorado's offset statute, which provides:

> Notwithstanding any other provision of this title, mutual debts or mutual credits, whether arising out of one or more contracts between the insurer and another person in connection with any action or proceeding under this part 5, shall be set off, and the balance only shall be allowed or paid, except as provided in subsections (2) and (4) of this section and section 10-3-532.

Colo. Rev. Stat. § 10-3-529(1).

The parties disagree about the meaning of Colorado's offset statute.  The Liquidator argues that it does not cover HHS's offset because (1) the statute only applies to "contracts;" (2) the Cooperative and HHS's debts are not "mutual;" and (3) HHS is a net debtor with respect to the Cooperative, so HHS's offset exceeds the permitted offset amount that the statute refers to as "the balance."

To interpret the Colorado offset statute, the Court looks to the Colorado Supreme Court's rules of statutory interpretation.  The Colorado Supreme Court has explained that the "primary purpose" of statutory interpretation is "to ascertain and give effect to the legislature's intent." *McCoy v. People*, 442 P.3d 379, 389 (Colo. 2019).  Courts should "look first to the language of the statute, giving its words and phrases their plain and ordinary meanings." *Id.*  Courts should also "read statutory words and phrases in context, and . . . construe them according to the rules of grammar and common usage." *Id.*

The Liquidator argues that the Colorado offset statute only applies to "contracts between the insurer and another person in connection with any action or proceeding under this part 5."[5] The relevant clause of the statute—the one beginning with "whether" and set off by commas— modifies those "mutual debts or mutual credits" that "shall be set off."  The apparent purpose of the clause is to clarify that "mutual debts or mutual credits" may be set off even if multiple contracts, *i.e.*, "one or more contracts," are involved.  The clause does not, however, appear to address whether mutual debts or mutual credits other than those arising from contracts may also be set off.  In other words, it is not clear from the plain language of the provision whether the clause is restrictive or non-restrictive.

Context supplies the answer.  "The legislature is presumed to intend that the various parts of a comprehensive scheme are consistent and apply to each other, without having to incorporate each by express reference in the other statutory provisions."  *Martinez v. People*, 69 P.3d 1029, 1033 (Colo. 2003) (citation omitted).  Subsection 5 of the offset statute permits certain offsets that are otherwise barred when "the contracts" meet certain requirements.  Colo. Rev. Stat. § 10-3-529(5).  Moreover, Subsection 6 provides:

> This section shall be effective January 1, 1993, and shall apply to all *contracts* entered into, renewed, extended, or amended on or after said date and to debts or credits arising from any business written or transactions occurring after January 1, 1993, pursuant to any *contract* including those in existence prior to January 1, 1993, and shall supersede any agreements or contractual provisions which might be construed to enlarge the setoff rights of any person under any contract with the insurer.  For purposes of this section, any change in the terms of, or consideration for, any *such contract* shall be deemed an amendment.

Colo. Rev. Stat. § 10-3-529(6) (emphasis added).

These neighboring provisions are highly suggestive that in the context of the entire statute the Colorado legislature did not intend for Subsection 1 to authorize offset beyond the realm of insurance contracts.  In the absence of a superior contrary argument, the Court finds that the relevant Colorado statute applies only to offset involving a contract.  Because HHS does not argue that it offset any contract it had with the Cooperative, it may not invoke Colo. Rev. Stat. § 10-3-529 to bypass the priority scheme set forth in Colo. Rev. Stat. § 10-3-541.

HHS urges that there is no reason for the offset statute to be limited to contracts.  This argument rests on an assumption that, under Colorado law, a broad right of offset is the default in insurance liquidation.  In fact, the Colorado Supreme Court has suggested that the opposite is true; the priority scheme set forth in Colo. Rev. Stat. § 10-3-541 is the default, and any statutory rights of offset constitute exceptions to that general policy.  *See Bluewater Ins. Ltd. v. Balzano,*

---

[5] "Part 5" appears to be a reference to "Part 5: Insurers' Rehabilitation and Liquidation," the section of the Colorado Revised Statutes in which the quoted section appears.  Colo. Rev. Stat. § 10-3-529(5).

823 P.2d 1365, 1374 (Colo. 1992) ("The general intent of the liquidation act was to protect the public and to establish uniformity in liquidations of insurance companies.").  Whatever the merits of HHS's policy argument about the precise contours of the Colorado offset statute, the Court is of the opinion that the better course is to hew to the plain language of the Colorado statute, bolstered by its statutory context.

HHS also responds that the presence of commas indicates that the "whether" phrase is non-restrictive.  While stylists recommend that restrictive clauses not be placed between commas, the presence of commas does not categorically rule out the possibility of a restrictive clause.  *Cf.* Bryan Garner, *The Redbook* § 1.6 (3d ed. 2013) (noting the recommended rule).  Nonetheless, the statutory context in which the provision is found offers strong evidence that HHS's reading, while grammatically preferable, is not what the Colorado legislature had in mind when it enacted the relevant statutory scheme.

In the alternative, HHS argues that Colorado recognizes a common law right of offset broader than its offset statute.  In support, HHS relies on *Bluewater*, but that reliance is misplaced.  *Bluewater* addressed a reinsurer's right, if any, to offset an insurer's unpaid premiums against its own contractual liabilities.  The Colorado Supreme Court concluded that the insurance commissioner had acted properly in interpreting then-governing state law to prohibit reinsurers from exercising an equitable right of offset.  *Bluewater*, 823 P.2d at 1373.  The Court assumed without deciding that "an equitable right to offset does obtain in the reinsurance context," and concluded that the legislature had abrogated any such right.  *Id.*

Then, in dicta, the Court addressed whether a common law right of offset was implicit in the insurance liquidation priority statute.  It answered that question in the negative, writing:  "In practice, the relief prayed for by the reinsurers, predicated on the existence of an equitable right to offset, would favor their private interest over the interest of policyholders, contrary to law."  *Id.* at 1374.  "A common law base line," the Court remarked, "is inapposite and serves only to deflect attention from the regulated character of the insurance business in general and of reinsurance contracts in particular."  *Id.*

Read together, the relevant discussion by the Colorado Supreme Court suggests that whatever common law right of offset does exist in Colorado may not be exercised in such a manner as to contravene the priority statute.  HHS's observation that most of the statements cited herein are dicta is well-taken, but dicta by a state's highest court is suggestive and can be persuasive, especially for a non-expert federal court seeking to interpret Colorado law.  HHS does not identify any other basis that might undercut the dicta to support its broad assertion that it may bypass the priority statute using the common law.  For these reasons, HHS's offset redirecting the Cooperative's 2015 reinsurance payments to its outstanding debts violates Colorado's insurance liquidation priority scheme.  The Court must still determine whether this Colorado law provides the rule of decision in this case.

### 4.      Colorado Law as the Federal Rule of Decision

Colorado insurance liquidation law applies here to prohibit HHS's offset because federal interests do not require a uniform, federal rule.  Arguing for the Netting Rule's preemptive force, HHS asserts that federal law should govern the property rights of the United States arising under

this "nationwide federal program[]." Gov't Mot. at 15 (quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979)).

HHS is partially correct. Under *Clearfield Trust Co. v. United States*, and *United States v. Kimbell Foods*, federal law may govern the United States' property interests arising from a nationwide federal program. 318 U.S. 363, 366 (1943); 440 U.S. at 727. Even when federal law governs a federal agency's property interests, however, a federal court must still "fashion the governing rule of law according to [its] own standards." *State of Montana v. United States*, 124 F.3d 1269, 1274 (Fed. Cir. 1997) (quoting *Clearfield Trust*, 318 U.S. at 367).

This principle, "however, does not necessarily mean that federal courts should *create* the controlling law." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) (emphasis added). "Absent a demonstrated need for a federal rule of decision, the [Supreme] Court has taken 'the prudent course' of 'adopt[ing] the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation.'" *Id.* (alterations in original) (quoting *Kimbell Foods, Inc.,* 440 U.S. at 740).

Federal law governs HHS's rights here. HHS's collection from and payments to insurers under the ACA's programs "perform[] a federal function," and HHS's authority to collect these contributions and issue these payments (although not its authority to use offset) "derive[s] . . . from [a] specific Act[] of Congress passed in the exercise of a 'constitutional function or power,'" the ACA. *Kimbell Foods*, 440 U.S. at 726 (quoting *Clearfield Trust Co.*, 318 U.S. at 366). These activities "arise from and bear heavily upon a federal program." *Id.* (alterations omitted). "In such contexts, federal interests are sufficiently implicated to warrant the protection of federal law." *Id.; see also State of Montana*, 124 F.3d at 1274 ("[For a] federal administrative agency congressionally authorized to implement a federal lending program, *Clearfield Trust* and *Kimbell Foods* require that federal law preempt state law and govern [the] case.").

Having decided that federal law governs, next "the court must determine if federal statutes provide a rule. If they do, then that rule must be applied." *State of Montana*, 124 F.3d at 1274 (citing *Kimbell Foods,* 440 U.S. at 727). "[I]f no federal statute supplies the rule of law, the court must determine whether to create federal common law or to incorporate state law as the rule of decision." *Id.*

Here, no federal statute provides an insurance liquidation priority scheme or other rule that would determine the priority of HHS's offset within a state's existing insurance liquidation scheme.[6] This case differs from *State of Montana*, in which a federal loan program's statute and regulations explicitly provided that inconsistent state regulatory laws "shall not be applicable" to the loan program contracts and the regulations set forth a contract term providing that "No liens

---

[6] The federal priority statute, 31 U.S.C. § 3713, "accords first priority to the United States with respect to a bankrupt debtor's obligations," *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 493 (1993). It cannot, however, be the source for a rule here. The McCarran-Ferguson Act, 15 U.S.C. § 1012, prohibits this Court from construing the federal priority statute—or any other statute not specifically related to the business of insurance—to supersede Colorado law's placement of insurance policy-holder claims ahead of HHS's claim. *Fabe*, 508 U.S. at 493.

or encumbrances shall be placed on the [the collateral] after the loan is approved." *Id.* at 1275. Unlike that loan program, the provisions creating the reinsurance and risk-adjustment programs are silent on insurance liquidation priority.

Without a statutory rule to apply, the Court must choose between formulating a uniform rule or adopting the otherwise applicable state-law rule of decision. The *Kimbell Foods* court considered three factors to answer this question: "(1) the need for national uniformity, (2) whether state law would 'frustrate specific objectives' of the federal program; and (3) the extent to which federal rules might 'disrupt commercial relationships predicated upon state law.'" *Id.* at 1274 (quoting *Kimbell Foods,* 440 U.S. at 728–29). Here, all three factors favor applying the state-law rule of decision.

### a.     Uniformity

"[F]ederal programs that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules." *Kimbell Foods*, 440 U.S. at 728 (quoting *United States v. Yazell*, 382 U.S. 341, 354 (1966)). "Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision." *Id.*

The reinsurance and risk-adjustment programs do not require a uniform rule regarding offset in insurance liquidation. Supreme Court precedent makes clear that federal programs adapted to state law do not require a uniform rule. In *United States v. Yazell*, the Supreme Court rejected arguments for a uniform rule applied to Small Business Administration ("SBA") loan contracts that would displace state coverture rules. 382 U.S. 341 (1966). Finding that the SBA's operations were "specifically and in great detail adapted to state law" and that the SBA individually negotiated in detail each loan transaction, the Supreme Court held that "there was no 'federal interest'" that justified supplanting loan agreements that were "important and carefully evolved state arrangements designed to serve multiple purposes." *Yazell*, 382 U.S. at 345-46, 353, 357. The Supreme Court came to a similar conclusion in *Kimbell Foods*, in which it found that Farmers Home Administration ("FHA") and SBA loan-processing procedures were adapted to state law and thus did not have, or require, uniform federal rules. *Kimbell Foods*, 440 U.S. at 733. Accordingly, the Supreme Court adopted the "readymade body of state law as the federal rule of decision" and held that "absent a congressional directive, the relative priority of private liens and consensual liens arising from [FHA] lending programs is to be determined under nondiscriminatory state laws." *Id.* at 739.

The reinsurance and risk-adjustment programs need not "by [their] nature . . . be uniform in character through the Nation." Even more than the SBA program in *Yazell*, the ACA's provision for separate exchanges, reinsurance, and risk-adjustment programs in all 50 states demonstrates that the ACA creates no requirement that could not be met by each state operating its own programs, presumably applying its own insurance liquidation priority scheme. Like the FHA loan-processing procedures in *Kimbell Foods* or the SBA loan program in *Yazell*, the ACA does not require that HHS's obligations to reinsurance and risk-adjustment program participants issue forth as "nationwide act[s] of the Federal Government, emanating in a single form from a single source." *Kimbell Foods*, 440 U.S. at 733 (quoting *Yazell*, 382 U.S. at 348). Although the reinsurance and risk-adjustment programs' requirements might not be adapted on an insurer-by-

insurer basis in the same way as the individually-negotiated loan contracts in *Yazell*, nothing suggests that the ACA programs' requirements could not have been adapted on a state-by-state basis to account for variations in insurance liquidation priority.

The adaptability of the reinsurance and risk-adjustment programs, evident on the face of the statute creating them and from the fact that states like Connecticut and Massachusetts may operate both or one of them, suggest that Colorado's insurance liquidation priority scheme is the appropriate federal rule of decision here.

### b.    Frustrating Specific Objectives of Federal Programs

HHS argues that without a uniform rule allowing offset in this context, the reinsurance and risk-adjustment programs will not be financially viable.

In *Kimbell Foods*, the Supreme Court rejected the proposition that ensuring funding for a nationwide program justifies displacing state law with a federal rule, noting that whatever obstacle treating the United States "like any other lender" creates, it does not undermine federal interests sufficiently to justify unrestricted federal priority—even in an area as "important to the Nation's stability as taxation." *Id.* at 738.

More generally, the Supreme Court has "repeatedly emphasized that 'in fashioning federal [common law] principles to govern areas left open by Congress, our function is to effectuate congressional policy.'" *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1410 (2018) (quoting *Kimbell Foods,* 440 U.S. at 738). Although the ACA does not authorize or determine the preemptive effect of HHS's offset, *see* IV.B.1 *supra*, the ACA's non-preemption clause suggests that the ACA does not authorize HHS to pursue the reinsurance and risk-adjustment programs' objectives whatever the cost to state regulatory authority. The ACA non-preemption clause's title alone—"No Interference with State Regulatory Authority"— suggests that the reinsurance and risk-adjustment programs can be properly implemented in the face of potentially less favorable, but not outright incompatible state insurance liquidation law, like Colorado's priority scheme.

HHS's inability under Colorado's insurance liquidation priority scheme to collect some funds from insolvent insurers that an alternate rule would otherwise allow it to collect does not frustrate "specific objective[s]" of the reinsurance and risk-adjustment programs. HHS's notices proposing and publishing the Netting Rule justify it as an efficiency measure, not a funding measure. The other rules implementing these programs are replete with variables affecting the programs' financial viability. When HHS's own fees and formulas determine what insurers must pay HHS and what HHS must pay insurers to balance each program, it is unclear why HHS must also preempt state insurance liquidation law to ensure the programs' financial viability. This Court will not infer on this record, as a matter of preemptive federal common law, that it is necessary to give HHS super-priority in state insurance liquidation proceedings in order to carry out either the programs' specific objectives or their broad policy goals.

### c.    Disruption of Commercial Relationships

A uniform rule allowing HHS's offset in insurance liquidation and preempting Colorado's insurance liquidation priority scheme would disrupt the expectations of the

Cooperative's other creditors, including its policyholders. Colorado's insurance liquidation law dictates the "priority of distribution of claims from the insurer's estate." Colo. Rev. Stat. § 10-3-541. The priority statute provides that "[e]very claim in each class shall be paid in full, or adequate funds shall be retained for such payment, before the members of the next class receive any payment." *Id.* It generally treats policyholders as Class 2 claims. *Id.* And it defines most "claims of the federal government" as Class 3 claims. *Id.* HHS offsetting amounts it owed to the Cooperative effectively elevated HHS's Class 3 claims above all other classes of creditors, contrary to Colorado's priority scheme.

Moreover, although the McCarran-Ferguson Act does not control here because the authority for HHS's offset was not an "Act of Congress," *see* IV.B.2 above, adoption of a uniform rule allowing HHS's offset would be at odds with, and perhaps even inconsistent with, the federal policy expressed by McCarran-Ferguson as applied in *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 509 (1993) (holding that Ohio law governs the priority of claims brought by the United States in a liquidation proceeding when the priority scheme places policyholder claims above the United States' claims). Formulating a uniform rule that disrupts the expectations of policyholders whose interests a state has chosen to protect for the sake of a federal agency's administrative efficiency runs counter to McCarran-Ferguson's statutory policy statement that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012.

\* \* \*

The ACA's state-by-state structure, the ACA's own non-preemption provision, and the role Congress assigned to HHS in administering the reinsurance and risk-adjustment programs on behalf of states undermine HHS's argument that federal interests require a uniform rule. HHS's argument that Colorado's prohibition of offset in insurance liquidation threatens the reinsurance and risk-adjustment programs' financial viability is too general of an interest to support the creation of a preemptive federal rule displacing unfavorable priority schemes. The federal policy expressed by the McCarran-Ferguson act and its application to priority schemes that protect policyholders' commercial expectations weigh against displacing Colorado's policyholder-protecting priority scheme with a uniform federal rule of administrative efficiency. Therefore, the Court applies Colorado's insurance liquidation priority scheme as the federal rule of decision. Under Colorado's priority scheme, HHS's offset was invalid.

## C.     Damages

The record before the Court is not adequate to grant the Liquidator's Motion for Summary Judgment on the amount of damages. Although the parties do not appear to dispute the damage amounts at stake in this case for purposes of the motion to dismiss, the accounting records attached to HHS's Motion to Dismiss contradict the allegation in the complaint that a single offset in the amount of $20,255,084 took place on August 23, 2016. Under the circumstances, a genuine dispute of material fact may yet exist with respect to the amount of money the Cooperative is due under the 2015 reinsurance program. Accordingly, further proceedings regarding that amount are necessary.

## V.      CONCLUSION

For the reasons set forth above, the plaintiff's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  The defendant's Cross-Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.  Count I of the Complaint is **DISMISSED**.

The parties are directed to confer in order to resolve the issue of the amount owed to the plaintiff under Count II of the Complaint.

The parties shall file by October 18, 2019, a Joint Stipulation proposing the amount and form of a final judgment in the event they are able to resolve the issue of the amount owed to the plaintiff.  If the parties are unable to resolve that issue by October 18, 2019, they shall file no later than that date a Joint Status Report proposing a process and a schedule by which the Court may resolve the issue of damages and any other pending issues.

Either the Joint Stipulation or the Joint Status Report, whichever the parties file, should include a list of any remaining unresolved issues that would prevent entry of a final judgment for the plaintiff.

It is so **ORDERED.**


s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**